## LICENSE AGREEMENT

THIS AGREEMENT, made effective as of the _13_ day of
_NOVEMBER_, 1989, by and between ALVARADO ORTHOPEDIC
RESEARCH, having an office at 9680 Alto Drive, La Mesa,
California 92041, (hereinafter referred to as "LICENSOR"), and
HALL SURGICAL DIVISION OF ZIMMER, INC., a Delaware Corporation
with offices at 1170 Mark Avenue, Carpinteria, California
92013-2918 (hereinafter referred to as "HALL SURGICAL").

WITNESSETH:

WHEREAS, LICENSOR represents and warrants that it owns
all of the right, title and interest in and to certain patent
rights and information pertaining to a device (such rights and
device hereinafter defined);

WHEREAS, HALL SURGICAL is desirous of obtaining certain
rights and licenses from LICENSOR relating to the
aforementioned patent rights and information; and

WHEREAS, LICENSOR is willing to grant such licenses and
rights upon the conditions hereof;

NOW, THEREFORE, for and in consideration of the premises
and the mutual promises hereinafter contained, and other good
and valuable consideration, the parties hereto have mutually
agreed as follows:

### ARTICLE I.  DEFINITIONS

The following terms as used in this Agreement shall,
unless the context clearly indicates to the contrary, have the
meanings set forth in this Article:

A. "Territory" shall mean all countries covered by this
Agreement as set forth in Attachment D.

1

EXHIBIT 1
Page 1 of 28

B. "Device" shall mean a gall-resistant surgical saw blade coated with a nickel-based material identified by LICENSOR with the trademark BRAZOL™, which trademark is used by LICENSOR to identify various coating compositions as described in the patent application(s) attached hereto as Attachment A, such device being coated by HITECH METALLURGICAL COMPANY, 7384 Trade Street, San Diego, California 92121-2422, in accordance with the EXCLUSIVE MANUFACTURING AGREEMENT comprising ATTACHMENT C, attached hereto.

C. "Licensed Patents" shall mean the patent(s) and/or patent application(s) specified in Attachment B hereto and any and all other patents and/or patent applications in the Territory now or hereafter during the term of this Agreement owned or controlled by LICENSOR and disclosing and claiming the Device, together with any and all patents that may issue or may have issued therefrom in the Territory including any and all renewals, divisions, continuations, continuations-in-part, reissues, substitutions, confirmations, registrations, revalidations, revisions, extensions or additions of or to any of the aforesaid patents and patent applications.

From time to time during the term of this Agreement, LICENSOR will provide HALL SURGICAL, upon request, with an updated version of Attachment B.

D. "Valid Claim" shall be deemed to mean a claim pending in an unexpired patent included within the Licensed Patents which has not been held unenforceable, unpatentable or invalid by a decision of a court or other governmental agency of competent jurisdiction, unappealable or unappealed within the time allowed for appeal, and which has not been admitted to be invalid or unenforceable through reissue or disclaimer. If in any country there should be two or more such decisions conflicting with respect to the validity of the same claim, the decision of the higher or highest tribunal shall thereafter control; however, should the tribunals be of equal rank, then

2

EXHIBIT 1
Page 2 of 28

the decision or decisions upholding the claim shall prevail when the conflicting decisions are equal in number, and the majority of decisions shall prevail when the conflicting decisions are unequal in number.

E. "Technology" shall mean all information, technical data or other know-how which relates to the manufacture, use or sale of the Device (including clinical data, medical uses and methods, product forms, specifications and manufacturing data) which LICENSOR has heretofore developed or acquired, or may hereafter develop or acquire, and possesses at any time during the term of this Agreement and which LICENSOR is free to disclose and furnish to HALL SURGICAL hereunder. The scope of this definition shall not have greater breadth than the description of "improvements" set forth in Article X.

F. "Product" shall mean any Device the manufacture, use or sale of which would, but for this Agreement, infringe a Valid Claim or any Device incorporating, or the manufacture, use or sale of which utilizes the Technology.

G. "Subsidiary" shall mean any corporation directly or indirectly owning, owned by, or under common ownership with the party in question to the extent of at least fifty percent (50%) of the voting shares, including directors' qualifying shares owned beneficially by such party, having the power to vote for directors.

## ARTICLE II.  DISCLOSURE

Promptly after the effective date of this Agreement and from time to time thereafter during the term of this Agreement, LICENSOR shall, to the extent that it has not already done so, disclose to HALL SURGICAL, Technology which is then known or possessed by LICENSOR.

3

EXHIBIT 1
Page 3 of 28

ARTICLE III.   GRANT

LICENSOR hereby grants to HALL SURGICAL and its Subsidiaries an exclusive license, within the Teritory, including the right to grant sub-licenses under Licensed Patents and Technology, to use, market, sell and distribute Products.   LICENSOR hereby also grants to HALL SURGICAL the exclusive right to use the trademark BRAZOL$^{TM}$ within the Territory for all Devices, pursuant to the Trademark Agreement provided in Attachment C.   HALL SURGICAL shall refrain from public disclosure, public use, and/or sale of the Device and Technology until all foreign applications listed in Attachment B are on file and pending in the respective foreign countries. It is understood that LICENSOR reserves the right to associate the BRAZOL$^{TM}$ trademark with other diverse coatings not included in the Technology and Device and not forming a part of this Agreement.

ARTICLE IV.   ROYALTIES

A.   In consideration of the licenses and rights granted by LICENSOR to HALL SURGICAL hereunder,

1.   HALL SURGICAL agrees to pay the following upon the execution of this Agreement, the Trademark Agreement, provided as Attachment C, and the Purchase Agreement, provided as Attachment D:

(i) TWELVE THOUSAND DOLLARS ($12,000.00) to LICENSOR for product development costs, legal fees in connection with the revisions to this Agreement and filing costs for U.S. Patent Applications listed in Attachment B. and for the U.S. Trademark Application for the Trademark BRAZOL.   HALL SURGICAL agrees to pay the filing costs for all foreign applications to bo filed at the request of HALL SURGICAL as noted in the foreign countries listed in Attachment B.

4

**EXHIBIT 1**

**Page 4 of 28**

(ii) HALL SURGICAL agrees to pay all prosecution costs and governmental fees including maintenance fees for the BRAZOL™ Trademark Application as well as for all applications, U. S. and foreign, listed in Attachment B. LICENSOR's Patent Counsel shall submit all bills to HALL SURGICAL, which bills will be payable when rendered.

2. HALL SURGICAL agrees to pay or cause to be paid the following royalties:

(i) a royalty of THREE PERCENT (3%) to LICENSOR for each unit of unribbed Product sold by HALL SURGICAL and its Subsidiaries; and

(ii) a royalty of SIX PERCENT (6%) to LICENSOR for each unit of ribbed Product sold by HALL SURGICAL and its Subsidiaries.

B. If a Licensed Patent fails to issue covering the Product, then the obligation to pay royalties under Paragraph A(2) of this Article shall terminate five (5) years after the date of the first commercial sale of Product by HALL SURGICAL or a Subsidiary or sublicensee of HALL SURGICAL in any country of the Territory. After the end of said five- (5) year period, no further royalties shall be payable under Paragraph A(2) of this Article with respect to any sale of any Product by HALL SURGICAL or any of its Subsidiaries or sublicensees.

C. The obligation to pay royalties to LICENSOR under this Article is imposed only once with respect to the same unit of Product regardless of the number of Valid Claims of Licensed Patents covering the same. There shall be no obligation to pay LICENSOR under this Article on sales of Product between HALL SURGICAL and its Subsidiaries and sublicensees or between any of them but in such instances the obligation to pay royalties shall arise upon sale by HALL SURGICAL or its Subsidiaries or sublicensees, to unrelated third parties.

5

**EXHIBIT 1**
**Page 5 of 28**

D.   If a patent or patents of a third party who is not a Subsidiary of HALL SURGICAL should exist during the term of this Agreement in any country covering the manufacture, use or sale of any Product, and if it should prove, in HALL SURGICAL's judgement, impractical or impossible for HALL SURGICAL or its Subsidiaries or sublicensees to continue the activity or activities licensed hereunder without obtaining a royalty-bearing license from such third party under such patent or patents or if HALL SURGICAL on the effective date of this Agreement has already obtained a license, then HALL SURGICAL shall be entitled to a credit against the payments due hereunder of any amount equal to the royalty paid to such third party not to exceed fifty percent (50%) of the royalty payment due under this Agreement, arising from the manufacture, use or sale of Product in said country.

E.   If at any time or from time to time a third party in any country shall, under right of a compulsory license granted or ordered to be granted by a competent governmental authority, manufacture, use or sell any Product with respect to which royalties shall be payable pursuant to Paragraph A of this Article, then HALL SURGICAL, upon notice to LICENSOR and during the period such compulsory license shall be effective, shall have the right to reduce such royalty on each unit of Product sold in such country to an amount no greater than the amount payable by said third party in consideration of its compulsory license.

ARTICLE V.  REPORTS

Within ninety (90) days after the close of each calendar quarter of each year during the terms of this Agreement (including the last day of any such calendar quarter following the expiration date of this Agreement), HALL SURGICAL shall report to LICENSOR all payments actually accruing under Article

6

EXHIBIT 1
Page 6 of 28

IV during such calendar quarter. Such quarterly reports shall indicate for such calendar quarter the number of units of Product sold by HALL SURGICAL with respect to which payment is due and the amount of such payment. In case no payment is due for any such period, HALL SURGICAL shall so report. HALL SURGICAL shall keep accurate records in sufficient detail to enable the aforesaid payments due under Article IV to be determined. Upon the request of LICENSOR, HALL SURGICAL shall permit an independent Certified Public Accountant selected by LICENSOR, except one to whom there shall be some reasonable objection by HALL SURGICAL, to have access, once in each calendar year during regular business hours and upon reasonable notice to HALL SURGICAL, to such of the records of HALL SURGICAL as may be necessary to verify the accuracy of the reports made during the previous calendar year, but said accountant shall not disclose to LICENSOR any information except that which should properly have been contained in such reports, and said audit right may not be exercised more than once in any calendar year. The records from which the royalty reports are prepared need not be retained by HALL SURGICAL longer than HALL SURGICAL's then current record retention policy for such documents.

## ARTICLE VI.   TIMES AND CURRENCIES OF PAYMENT

Payments shown to have accrued by each of the quarterly reports provided for under Article V above shall be due and payable on the date such report is due and shall be paid in United States Dollars, or at HALL SURGICAL's election, in the currency of the country in which the Product was sold, HALL SURGICAL as AGENT for LICENSOR shall deduct or withhold from such payments and pay to the proper taxing authority all taxes or fees required by law or regulation to be deducted or withheld with respect to such payments and proof of payment secured and sent to LICENSOR as evidence of such payment. The

**EXHIBIT 1**

**Page 7 of 28**

rate of exchange to be used in computing the amount of local currency equivalent to the United States Dollars due to LICENSOR as royalty shall be the commercial exchange rate in effect in New York City, New York on the last business day of the calendar quarter for which payment is being made. If at any time conditions or legal restrictions prevent the prompt remittance of the royalties due to LICENSOR, HALL SURGICAL shall have the right and option to make such payments by depositing the amount thereof, subject to an appropriate adjustment due to the inability to obtain appropriate tax deduction in local currency to LICENSOR's account in a bank or other depository selected by LICENSOR. HALL SURGICAL shall be excused from remitting such royalties in accordance with the provisions of this Article during the pendency of such legal restrictions.

## ARTICLE VII. INFRINGEMENT

A. In the event that a third party appears to be infringing one or more of the Licensed Patents, HALL SURGICAL shall bring such infringement to the attention of LICENSOR. If LICENSOR does not institute infringement proceedings against such third party within ninety (90) days after written notice to HALL SURGICAL that such third party appears to be infringing one or more of the Licensed Patents, HALL SURGICAL shall have the right to take whatever steps in its own and sole discretion it shall deem advisable, including but not limited to, settlement or the filing of suit for damages or to enjoin such sales or offers for sale by such third party. LICENSOR agrees to perform all acts which may become necessary or desirable to vest in HALL SURGICAL the right to institute any such suit and shall, upon reasonable notice, cooperate and, to the extent deemed necessary or desirable by HALL SURGICAL and at HALL SURGICAL's expense, participate in any suit to enjoin such infringement and to collect, for the benefit of HALL SURGICAL,

8

**EXHIBIT 1**
**Page 8 of 28**

damages, profits and awards of any nature recoverable for such infringement. The costs and expenses of any such suit or settlement shall be borne by HALL SURGICAL. Recovery of damages in any suit or settlement with any third party shall inure to the benefit of HALL SURGICAL; however, HALL SURGICAL shall after first recouping its reasonable attorneys' fees and costs incurred and in connection with such suit or settlement apply any excess recovered damages to reimbursing LICENSOR, to the extent of such excess, the royalties that would have been payable to LICENSOR.

   B.   LICENSOR agrees that should a third party institute a patent infringement suit in any country of the Territory against HALL SURGICAL or a Subsidiary of sublicensees of HALL SURGICAL predicated on HALL SURGICAL's or its Subsidiaries' or sublicensees' manufacture, use or sale of Product, HALL SURGICAL shall have the right to reduce by fifty percent (50%) royalties due to LICENSOR in such country hereunder with respect to such Product. In the event such third party suit is successfully defended by HALL SURGICAL, it shall upon final determination thereof, pay to LICENSOR all royalties that would have been payable to LICENSOR if such suit had not been instituted, less reasonable attorneys' fees and costs incurred by HALL SURGICAL in connection with such suit, which shall not exceed the total amount of royalties payable to LICENSOR by virtue of said successful defense and final determination.

## ARTICLE VIII.  PATENT APPLICATIONS

   A.   HALL SURGICAL shall have the right to have patent applications covering the Device filed at its own expense in those countries which HALL SURGICAL in its sole discretion deems advisable in view of its commercial operations. Should "those countries" include country or countries not listed in Attachment D, such filing and any rights to be granted to HALL SURGICAL in such countries shall be subject to a separate

9

**EXHIBIT 1**
**Page 9 of 28**

Agreement to be negotiated between LICENSOR and HALL SURGICAL. LICENSOR agrees to execute or cause to be executed all documents necessary or desirable for the purpose of applying for and obtaining patents thereon. All such applications in which LICENSOR is the sole inventor shall be owned by LICENSOR and all such applications where LICENSOR and an employee of HALL SURGICAL are joint inventors shall be owned jointly by LICENSOR and HALL SURGICAL. LICENSOR shall control the prosecution of all patent applications within the Licensed Patents but shall provide or cause to be provided to HALL SURGICAL a copy of all correspondence to and from the patent authorities of each country of the Territory in which such patent application has been filed, so as to afford HALL SURGICAL sufficient time to comment and advise. The cost of filing patent applications in a country of the Territory where the filing was made by HALL SURGICAL or at HALL SURGICAL's request as well as the expense incurred by LICENSOR in prosecuting and in maintaining such application, shall be paid by HALL SURGICAL. HALL SURGICAL's obligation to pay for patent prosecution expenses shall not require HALL SURGICAL to pay for expenses of prosecution or appeal other than in the Patent Office of the country concerned.

B. It is expressly understood and agreed that patent applications may be filed by LICENSOR at LICENSOR's expense in any country in which HALL SURGICAL elects not to file a patent application and/or in any country not listed in Attachment B.

## ARTICLE IX. REISSUE

In the event HALL SURGICAL requests that LICENSOR file an application for reissue of a Licensed Patent of the United States to correct an infirmity and with such request, in support thereof, provides to LICENSOR a written legal opinion of independent patent counsel, then LICENSOR within sixty (60) days of receipt of such request shall either instruct patent

10

**EXHIBIT 1**
**Page 10 of 28**

counsel of its choice to file such an application for reissue, or advise HALL SURGICAL that it chooses not to file such application. If LICENSOR chooses not to file an application for reissue, then LICENSOR and HALL SURGICAL shall mutually agree upon independent patent counsel, who shall review LICENSOR's request and reasons given in support thereof and shall provide to LICENSOR and HALL SURGICAL an opinion as to the necessity or desirability for the filing of such an application.

If such independent patent counsel selected by LICENSOR and HALL SURGICAL recommends that the application for reissue be filed and LICENSOR elects to file for reissue, then LICENSOR shall direct patent counsel of its choice to file such an application, and the cost of such independent counsel's opinion and the costs of filing said application shall be shared equally by the LICENSOR and HALL SURGICAL. In the event that LICENSOR elects not to file for reissue contrary to the recommendation of independent patent counsel, then HALL SURGICAL shall have the option to terminate this Agreement, or to convert the exclusive license granted in Article III above to a nonexclusive license and to reduce by one-half the royalties provided for in Article IV above, effective upon the date HALL SURGICAL elects to convert the license to nonexclusive.

## ARTICLE X.   IMPROVEMENTS IN PRESENT APPLICATIONS

LICENSOR will disclose to HALL SURGICAL all improvements relating to the Device which are invented, developed or otherwise acquired by LICENSOR during the five- (5) year period commencing on the effective date of this Agreement.   HALL SURGICAL shall automatically have, subject to all of the terms and conditions of this Agreement but without any additional royalty, a worldwide exclusive license, including the right to grant sublicenses, with respect to and under any patents or

11

**EXHIBIT 1**
**Page 11 of 28**

patent applications shall be added to the Licensed Products. LICENSOR shall provide HALL SURGICAL with access to Technology developed or acquired by LICENSOR relating to said improvements and HALL SURGICAL shall automatically have, subject to all the terms and conditions of this Agreement but without any additional royalty, an exclusive license to use such Technology within the Territory, provided HALL SURGICAL agrees to pay all expenses for patent application preparation, filing and prosecution. For the purposes of this section, "improvements" shall be limited to improvements in the features, structures, and process steps disclosed in the patent applications listed in Attachment B, but shall not include changes, additions, alterations, and/or modifications which result in a different combination device, a coating having materially different constituent ingredients or ratios, and/or materially different structure and/or function. Applications of the BRAZOL$^{TM}$ coating on other than medical-surgical products are expressly not included in this Agreement. Should HALL SURGICAL wish to apply the BRAZOL$^{TM}$ coating on other than medical-surgical applications, a separate Agreement between the parties hereto shall have to be negotiated and executed.

ARTICLE XI.  PRODUCT TESTING AND COMPLIANCE

At HALL SURGICAL's request, LICENSOR shall aid and assist HALL SURGICAL:

(1) In conducting laboratory and clinical evaluation of Product, and;

(2) in preparing accurate labels, labeling, and advertising for Product as those terms are defined in the Federal Food, Drug & Cosmetic Act; and

(3) in securing the approval of any state or federal regulatory agency which approval may be necessary to commence or continue sales of Product; and

12

**EXHIBIT 1**
**Page 12 of 28**

(4) in defending Product before any state or federal regulatory agency which may seek to seize, ban or prevent the introduction of Product into commerce.

It is agreed and understood by and between the parties that the foregoing aid and assistance shall not be financial, but shall be given by way of review of protocols, materials and data, personal consultations, preparation of written statements and oral testimony.  HALL SURGICAL shall reimburse LICENSOR for all reasonable out-of-pocket expenses which LICENSOR may incur by reason of the foregoing and HALL SURGICAL shall have the exclusive and sole right to use or disclose information and data resulting from such aid and assistance.

## ARTICLE XII.  DEVELOPMENT RECOGNITION

LICENSOR hereby grants to HALL SURGICAL and its Subsidiaries the right to use LICENSOR's name in labeling, advertising and promotional literature, to acknowledge that Product was developed by or in cooperation with LICENSOR, e.g., "Developed by Alvarado Orthopedic Research", or "Developed in cooperation with Thomas Petersen, M.D.".  Such acknowledgement shall be used on such labeling, advertising and promotional literature as will, from time to time, be agreed upon between the parties.  Such grant shall continue for so long as HALL SURGICAL and its Subsidiaries shall manufacture, distribute or sell Product in accordance with the terms of this Agreement. Such grant, however, shall not extend to the use of LICENSOR's name or the name "Thomas Petersen, M.D." as a trademark for or as the name of Product.

## ARTICLE XIII.  CONFIDENTIALITY

Each party undertakes to keep secret and confidential and not to disclose to any third party, except as it is necessary in carrying out the purpose of this Agreement, during the term of this Agreement and for a period of five (5) years

13

**EXHIBIT 1**
**Page 13 of 28**

thereafter any information, data or know-how disclosed to it by the other party except:

(1) information, data and know-how which at the time of disclosure is in the public domain or publicly known or available;

(2) information, data or know-how which, after disclosure, becomes part of the public domain or publicly known or available by publication or otherwise, except by breach of this Agreement by the receiving party;

(3) information, data or know-how which the receiving party can establish by competent proof was in its possession at the time of disclosure by the other party;

(4) information, data and know-how which the receiver receives from a third party; provided, however, that such information was not obtained by said third party from the other party; and

(5) information, data and know-how which the receiver derives independently of such disclosure.

## ARTICLE XIV.   EFFECTIVE DATE AND TERM

A.   This Agreement will become effective on the day and year first written above and will remain in effect until and will expire upon the expiration of the last to expire of the patents, U.S. and foreign, licensed hereunder or five (5) years from the first commercial sale of the Product in any country, whichever is last to occur.   After such expiration of this Agreement, HALL SURGICAL shall have the right to make, use and sell Product without the further payment of royalty or otherwise accounting to LICENSOR.   However, HALL SURGICAL's right to use the BRAZOL$^{TM}$ Trademark shall terminate upon expiration of this Agreement.

B.   HALL SURGICAL shall have the right to terminate this Agreement with respect to any country or countries upon sixty (60) days' notice to LICENSOR.   If HALL SURGICAL should

**EXHIBIT 1**
**Page 14 of 28**

exercise such right to terminate this Agreement, HALL SURGICAL's license under any patents or patent applications in such country or countries licensed under Article III hereof shall terminate, as shall rights to use the BRAZOL$^{TM}$ Trademark, as shall its right to make further use in such country or countries of the Technology acquired from LICENSOR under this Agreement, and which HALL SURGICAL is obliged to hold in confidence pursuant to Article XIII of this Agreement, either in Product sold in any such country or in manufacturing processes carried out in any such country.

ARTICLE XV.  TERMINATION FOR CAUSE

Failure by LICENSOR or HALL SURGICAL or of any of its Subsidiaries to comply with any of the obligations and conditions herein contained, unless such failure results from or is caused by applicable laws or regulations, shall entitle the other party to give the party in default notice requiring it to make good such default. If such default is not made good within ninety (90) days after the receipt of such notice, the notifying party shall be entitled (without prejudice to any of its other rights conferred on it by this Agreement) to terminate this Agreement by giving notice to take effect immediately.  The right of either party to terminate this Agreement, as hereinabove provided, shall not be affected in any way by its waiver of, or failure to take action with respect to, any previous default.

ARTICLE XVI.  RIGHT AND OBLIGATIONS UPON TERMINATION

Termination of this Agreement for any reason shall be without prejudice to:

(1) LICENSOR's right to receive all royalties accrued under Article IV and unpaid on the effective date of such termination,

**EXHIBIT 1**
**Page 15 of 28**

(2) the rights and obligations provided in Articles V and XIII hereof, and

(3) any other remedies which either party may then or thereafter have hereunder or otherwise.

Upon the termination of this Agreement prior to the completion of the term provided for in Paragraph A of Article XIV, HALL SURGICAL may notify LICENSOR of the amount of Product that HALL SURGICAL, its Subsidiaries and sublicensees, then have on hand and HALL SURGICAL, its Subsidiaries and sublicensees, shall then be permitted by LICENSOR to sell that amount of Product, but no more, provided that HALL SURGICAL shall pay royalties thereon at the rate and at the time herein provided and render reports thereon in the manner herein provided.

## ARTICLE XVII.  ASSIGNMENT

HALL SURGICAL may assign its rights under this Agreement in whole or in part to any Subsidiary or Subsidiaries, which shall be substituted directly for it hereunder. At HALL SURGICAL's request, LICENSOR shall enter into a separate counterpart agreement with any such Subsidiary. Such counterpart agreement shall be in the same form as this Agreement except for necessary changes in Licensed Patents to reflect the extent of the assignment, the substitution of the Subsidiary's name, and the effective date of the assignment. This Agreement shall not otherwise be assignable by either party without the prior written consent of the other party, except by HALL SURGICAL to the successor or assignee of substantially all of its business related to medical products. It is expressly understood and agreed, however, that the assignor of any rights hereunder shall remain bound by the obligations hereof.

16

**EXHIBIT 1**

**Page 16 of 28**

## ARTICLE XVIII.   MINIMUM PRODUCTION REQUIREMENTS

On or before February 1, 1990, LICENSOR shall cause to have delivered to HALL SURGICAL 2,000 Devices which have been supplied by HALL SURGICAL to LICENSOR on or before January 1, 1990.   Thereafter, the following minimum order requirements on the part of HALL SURGICAL shall apply:

(a)   In the months from February 1, 1990 through December 31, 1990, 2,000 devices per month;

(b)   In the months from January 1, 1991 through December 31, 1991, 2,500 devices per month;

(c)   In the months from January 1, 1992 through December 31, 1992, 3,000 devices per month;

(d)   In the months from January 1, 1993 through December 31, 1993, 3,300 devices per month;

(e)   In the months from January 1, 1994 through December 31, 1994, 3,600 devices per month;

(f)   In the months from January 1, 1995 through December 31, 1995, 3,900 devices per month;

(g)   In succeeding years, defined from January 1 of a particular year through December 31 of the next year, the minimum order requirements shall remain at 3,900 per month;

(h)   Should HALL SURGICAL fail to achieve the minimum order requirements as set forth above in any six (6) consecutive months, LICENSOR shall notify HALL SURGICAL in writing that such failure constitutes a deficiency under the terms and conditions of this Agreement which must be immediately rectified; if, thereafter, in the succeeding three (3) months, HALL SURGICAL shall fail to achieve the minimum order requirements in each of the three (3) months, thereafter, LICENSOR shall have the option at LICENSOR'S sole discretion to convert this Agreement to a Non-Exclusive Agreement by informing HALL SURGICAL of such conversion in a writing mailed within thirty (30) days of the end of the last of the above-

17

**EXHIBIT 1**
**Page 17 of 28**

described three (3) months. If such conversion takes place, LICENSOR agrees to the following terms and conditions:

   i) LICENSOR agrees that the terms and conditions of any license granted to any third party shall be equivalent to the terms and conditions of this Agreement; LICENSOR shall furnish HALL SURGICAL with a copy of any executed such third party license for review and verification;

   ii) Any such third party license shall require use of HITECH Metallurgical as exclusive manufacturer for BRAZOL coating of blades;

   iii) Should any such third party license be executed, LICENSOR shall reimburse HALL SURGICAL 50% of all monies paid LICENSOR by HALL SURGICAL pursuant to Article IV, subsections A1(i) and A1(ii) of this Agreement as well as pursuant to Section 8 of the Exclusive Manufacturing Agreement comprising Attachment C hereto.

   i) Should the Food and Drug Administration issue any order or perform any act preventing sale of the Devices, until such time as such order or act is (are) rescinded, the minimum order requirements of sections (a)-(g) above shall be suspended.

## ARTICLE XIX. NOTICES

Any notice or report required or permitted to be given or made under this Agreement by one of the parties hereto to the other shall be in writing and shall be deemed to have been sufficiently given or made for all purposes if mailed by Registered Mail, postage prepaid, addressed to such other party at its respective address as follows:

TO LICENSOR:   Thomas D. Petersen, M.D.
       Alvarado Orthopedic Research
       9680 Alto Drive
       La Mesa, California 92041

18

**EXHIBIT 1**
**Page 18 of 28**

TO HALL SURGICAL:    President
                     Hall Surgical
                     Division of Zimmer, Inc.
                     1170 Mark Avenue
                     Carpinteria, California  93013-2918

or to such other address as the addressees shall have
theretofore furnished in writing to the addressor.

ARTICLE XX.  ENTIRE AGREEMENT AND AMENDMENTS

    This Agreement contains the entire understanding of the
parties with respect to the matter contained herein.    The
parties hereto may from time to time during the continuance of
this Agreement, modify, vary or alter any of the provisions of
this Agreement, but only by an instrument duly executed by both
parties hereto.

ARTICLE XXI.  GOVERNING LAW

    This Agreement shall be constructed in accordance with
the laws of the State of California.

    IN WITNESS WHEREOF, the parties hereto have caused this
Agreement to be executed as of the date first above written.

                            HALL SURGICAL, INC.
                            Division of Zimmer, Inc.


_Barbara Modie_                By: _George Stringsill_  11/14/89.
Witness                            President.


                            ALVARADO ORTHOPEDIC RESEARCH


_Cheri Cournoyer_              By: _Thomas D. Petersen_
Witness                            Thomas D. Petersen, M.D.
                                   President
                                   11/13/89

                         19                    **EXHIBIT 1**
                                               **Page 19 of 28**

ATTACHMENT  A

**EXHIBIT 1**
**Page 20 of 28**

## ATTACHMENT  B

### LICENSED PATENTS AND PATENT APPLICATIONS

| Country | Ser. No. | Filing Date | Patent No. | Grant Date |
|---------|----------|-------------|------------|------------|
| USA | 07/308,607 | Feb. 10, 1989 | | |
| USA | 07/308,608 | Feb. 10, 1989 | | |
| USA | 07/308,609 | Feb. 10, 1989 | | |

---

### COUNTRIES WHERE CORRESPONDING FOREIGN APPLICATIONS ARE TO BE FILED

Canada
Australia
Japan

European  Patent  Application  Designating  the  Following Countries:

France
United Kingdom
Germany
Spain
Italy

21

**EXHIBIT 1**

**Page 21 of 28**

## EXCLUSIVE MANUFACTURING AGREEMENT

ATTACHMENT C TO THE AGREEMENT BETWEEN ALVARADO AND HALL SURGICAL

THIS AGREEMENT IS made this ___13___ day of __NOV_____,
1989 by and between Hall Surgical Division of Zimmer, Inc., a
corporation of Delaware having a principal office address at
1170 Mark Avenue, Carpinteria, California    92013-2918
(hereinafter referred to as "Hall Surgical") and KENNETH H.
HOLKO, INC., d/b/a HITECH METALLURGICAL, whose principal
address is 7384 Trade Street, San Diego, CA    92121,
(hereinafter referred to as "Hitech").

RECITALS:

WHEREAS, Hall Surgical is in the business, development,
sale and use of surgical instruments, including reciprocating,
sagittal and cast saw blades (hereinafter "Blade products");
and

WHEREAS, Hitech is in the business of manufacturing and
service involving metallurgical treatment and applications to
products; and

WHEREAS, Hall Surgical and Hitech desire to enter into a
relationship whereby Hitech will act as the exclusive
manufacturer for Hall Surgical for the BRAZOL coated Blade
products delineated herein on the terms and conditions
hereinafter set forth:

IT IS MUTUALLY AGREED AS FOLLOWS:

1.    Hall Surgical hereby appoints Hitech as the exclusive
manufacturing supplier for providing coated surgical blades of

Page 22(A)

**EXHIBIT 1**
**Page 22 of 28**

the sagittal, reciprocating and cast saw blade designs. During the continuance of this Agreement, Hall Surgical shall not contract directly or indirectly on behalf of itself or any entity with whom Hall Surgical is in partnership or corporations or affiliates of Hall Surgical *concerning Brazol coating* Hall.

2.    Term.    The term of this Agreement shall run concurrently with the term of the Licensing Agreement between Alvarado Orthopedic Research and Hall Surgical to which this Agreement is Attachment C.

3.    Manufacturer's Obligation.    Hitech as a manufacturer hereby agrees that it will faithfully perform its coating services for such product as Hall Surgical shall require under this Agreement within the following specifications:

    a.    Hitech will provide a coating on surgical blades of the oscillating and Z-blade designs to reduce wear during use.

    b.    The coating thickness will be controlled to a thickness of from .0005 to .002 inch total for both sides. Hitech will make all reasonable efforts to standardize total coating thickness for both blade sides from .0005-.0015 inches within the first year of this Agreement. Until such standardization is achieved, a photoetching process may be used by Hall Surgical to adjust uncoated blade thickness. After such standardization is achieved, Hall Surgical may use the photoetching process to allow increased thickness of uncoated blades.

    c.    Coating composition will be within the range described in the Brazol patent applications currently pending.

    d.    Coating thickness will be checked in a manner to be agreed upon by the parties hereto and quality of finish will be approved by Hall Surgical.

EXHIBIT 1
Page 23 of 28

e.        Straightening of Blades shall be the responsibility of Hitech to the following standards:

i) oscillating blades will be to a tolerance of within 0.010 inches of straightness over the entire length of the blade;

ii)   reciprocating blades, because of the difficulty in measuring the elevated ribs thereof, will be to a standard of "visually straight";

iii)   if the cost of straightening blades as documented by Hitech becomes prohibitive, after one year of production, thereafter these increased costs shall be incorporated into the Price Adjustments of Section 6 below.

4.    Standards for Raw Product.   Hall Surgical agrees to provide Hitech with an adequate quantity of blades for Hitech to coat which conform to the following minimum standards:

a.        The reciprocating blades will be made from type 420 annealed stainless steel and the oscillating blades and cast saw blades from type 410 annealed stainless steel. The mixture of different types of blades shall be such that no more than 5% shall have a coating length of more than 4 inches. Any mix-ups in material composition for any blades provided by Hall Surgical to Hitech will be the total responsibility of Hall Surgical.   Blade surfaces will be clean and free of any oxide, discoloration, corrosion, oil or grease and will be electropolished and ready to coat.

5.    Price.   Hall Surgical will pay Hitech for each coated blade the sum of $2.95.

6.    Price Adjustment.   The price provided for in paragraph 5 above will be adjusted annually on the first of April, based upon the Consumer Price Index (C.P.I.). However, should Hitech be able to demonstrate that actual changes in price of materials used for coating and fixturing blades, labor

Page 22(C)

EXHIBIT 1

Page 24 of 28

costs, and energy costs exceed the C.P.I. by a significant amount, then the parties hereto agree that the coating price shall be adjusted as simply percentage increase or decrease, based upon the sum of the percentage change in the above factors. The parties hereto agree to bargain in good faith concerning changes in pricing.

7.    Minimum Purchase Requirement.  Hall Surgical shall purchase amounts of blade coatings from Hitech in conformance with the minimum order requirements contained in the said Agreement between Alvarado Orthopedic Research, Inc. and Hall Surgical, and in addition thereto, such other amount of products as Hall Surgical may require.  Such requirement to purchase blade coatings in conformance with the minimum order requirements shall expire on December 31, 1990 and, thereafter, the procedure set forth in Article XVIII, subsection (h) of the License Agreement to which this Agreement is Attachment C shall apply.  In order to insure delivery to Hall Surgical during any month of such additional amount, Hall Surgical shall place the order and deliver blades for the additional amount of products not later than the 5th day of each month for delivery during the following month.  In the event that the order is not so given, Hitech will endeavor to make delivery within a reasonable time after the order is placed, but cannot guarantee delivery during the same time period.  For the purposes of this clause, a "reasonable time" shall be defined as 45 days.

8.    Tooling Fee.  Hall Surgical agrees to pay to Hitech an initial $1,000.00 fee for tooling materials for blade coating and, thereafter, Hall Surgical agrees to pay for tooling refurbishment and tooling replacement during the life of this Agreement up to $500.00 per year.  However, in the event tooling refurbishment and tooling replacement costs exceed $500.00 in any given year, due to extraordinary

Page 22(D)

EXHIBIT 1
Page 25 of 28

circumstances, Hitech shall notify Hall Surgical in writing and the parties hereto agree to bargain in good faith to agree upon adjustments in tooling refurbishment and tooling replacement fees which are reasonable and acceptable to both parties. Hitech agrees to limit use of the tooling solely for the purposes of this Agreement.

9.      Payment.  Hall Surgical shall pay to Hitech for products delivered under this Agreement on any of the following terms:

a.      Cash with order, COD by express or net 45, all FOB San Diego, California.  Hall Surgical shall make all best efforts to pay net 30.

b.      Any tax owed to any entity after Devices are shipped to Hall Surgical and concerning sale of the Devices shall be the responsibility of Hall Surgical.

10.     Report of Sales.  Hall Surgical shall furnish Hitech copies of all reports furnished to Alvarado Orthopedic Research pursuant to Article V of the Agreement to which this Agreement is Attachment C.

11.     Territory.  This Agreement and the requirements herein shall cover the territory including all countries for which Hall Surgical has paid for the filing of patent applications including those filed in the United States and corresponding applications in foreign countries.

12.     Warranty of Quality.  Hitech warrants that Hitech will make all reasonable efforts to assure that the Blade product coatings which it sells to Hall Surgical shall be free from defects in workmanship or material.  However, if, due to the nature of the coating process, some blades shall not be free of such defects, Hitech shall, at no further charge to Hall Surgical, either recoat defective blades or coat replacement blades furnished by Hall Surgical.  In any case,

Page 22(E)

**EXHIBIT 1**
**Page 26 of 28**

Hall Surgical shall bear the cost of defective blades which are not repairable. Except as herein stated, Hitech shall not be liable for any damages or for the breach of any warranty, express or implied, or for any other obligation or liability on account of the products covered by this Agreement, which it may manufacture and sell to Hall Surgical.

13. <u>Delivery of Product</u>. Hitech shall make delivery of the products to Hall Surgical either at their place of business as set forth in this Agreement, or at any other place within the United States and to any other person, firm or corporation designated by Hall Surgical, all at the cost of Hall Surgical. In the event, however, that Hitech is unable to make delivery of any product for any reason beyond its control, Hall Surgical shall not have the right to cancel such order for 60 days beyond the time specified herein, but may cancel the individual order thereafter.

14. <u>Termination</u>. Either party, at its election, may treat this Agreement breached and, without prejudice to any other of its rights, may forthwith terminate this Agreement by written notice to the other party on occurrence of any of the following events:

a. There shall be a substantial failure by the other party to perform one or more of its obligations hereunder which shall not have been cured within sixty (60) days after written notice specifying the nature of such failure.

b. A receiver of all or substantially all of the property of the other party shall be appointed and not removed within thirty (30) days.

c. The other party shall become or be declared insolvent.

Page 22(F)

EXHIBIT 1
Page 27 of 28

d.      The other party shall file a petition in bankruptcy under Chapter 7 or shall be adjudged a bankrupt.

15.     _Notices_.  Any notice, request, demand, or other communication required or permitted hereunder shall be deemed to be properly given when deposited in the United States mail, postage prepaid to the parties as hereinabove designated unless such other address shall have been given in written form.

16.     _Entire Agreement_.  This Agreement, including the Exhibits attached hereto, constitutes the entire agreement between Hall Surgical and Hitech concerning the subject matter hereof and supersedes all prior and contemporaneous agreements between the parties.  This Agreement may be amended only by an instrument in writing which expressly refers to this Agreement and specifically states that it is intended to amend it.  No party is relying upon any warranties, representations, or inducements not set forth herein.

The parties hereto have caused this Agreement to be executed at San Diego, California, on the day and year first above written.

Hall Surgical

BY: _____
PRESIDENT.    11/14/89.
Hitech Metallurgical Co.

BY: _____
President
11/13/89

**EXHIBIT 1**
**Page 28 of 28**