UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| ALVARADO ORTHOPEDIC RESEARCH, L.P., et al., | CASE NO. 11-CV-246-IEG (RBB) |
|---|---|
| Plaintiffs, | **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR SANCTIONS.** |
| vs. | |
| LINVATEC CORP., et al., | [Doc. No. 96] |
| Defendants. | |

Before the Court is Defendant Linvatec, Inc.'s motion for summary judgment, which also requests sanctions. [Doc. No. 96.]  For the reasons below, the Court hereby **DENIES** Defendant's motion in its entirety.

## BACKGROUND

This is a breach of contract case arising from a dispute over royalty payments under a technology licensing agreement.  In the 1980's, Dr. Thomas Peterson and metallurgical engineer Kenneth Holko developed surgical saw blade technology, including a nickel-based blade coating ("BRAZOL") and a "ribbed" blade shape, intended to reduce the accumulation of fine metal debris in open wounds during orthopedic surgery.

In 1989, Alvarado Orthopedic Research, Inc., a general partnership whose principal is Dr. Peterson, and the Hall Surgical Division of Zimmer, Inc. ("Zimmer"), entered into the subject license agreement, which gave Zimmer the right to sell products using the saw blade technology in exchange for a $12,000 lump

sum and prospective royalty payments. [*See* Doc. No. 96-3 ("Agreement").] The written agreement provides for a 3% royalty to Alvarado for each unit of unribbed product sold, and a 6% royalty for each unit of ribbed product sold. [Agreement IV.A.2.]

"Product" is defined as "any Device the manufacture, use or sale of which would, but for this Agreement, infringe a Valid Claim or any Device incorporating, or the manufacture, use or sale of which utilizes the Technology." [Agreement I.F.]

"Device" is defined to as "a gall resistant surgical saw blade coated with a nickel-based material identified [as] BRAZOL . . ." [Agreement I.B.]

"Valid Claim" is defined as "a claim pending in an unexpired patent included within the Licensed Patents . . ." [Agreement I.D.]

"Technology" is defined as "all information, technical data or other know-how which relates to the manufacture, use or sale of the Device . . ." [Agreement I.E.]

When the license agreement was entered, no issued patents yet covered the rib and BRAZOL technologies. But the agreement's definition for "Licensed Patents" prospectively encompassed "the patent(s) and/or patent applications specified in Attachment B and any and all other patents and/or patent applications [] now or hereinafter during the term of the Agreement," as well as, *inter alia*, "any and all . . . continuations, continuations-in-part . . ." [Agreement I.C.] And Attachment B listed, *inter alia*, three U.S. patent applications and corresponding foreign applications in, among other locales, Canada. [*See* Doc. No. 96-3 at 22 ("Attachment B").]

The length of the obligation to pay royalties under the agreement hinged on whether patents ever issued. [Agreement XIV.A.] If no patents issued, the "obligation to pay royalties . . . [would] terminate five (5) years after the date of the first commercial sale of Product." [*Id*.] If patents did issue, the obligation would expire "upon the expiration of the last to expire of the [licensed] patents." [*Id*.]

In the early 1990's, five patents issued variously covering the rib and BRAZOL technologies:

- U.S. Patent No. 5,002,555 ("'555 Patent")
- U.S. Patent No. 5,133,728 ("'728 Patent")
- U.S. Patent No. 5,135,533 ("'533 Patent")
- U.S. Patent No. 5,149,597 ("'597 Patent")
- Canadian Patent No. 2,008,117 ("Canadien Patent")

In 1994, Zimmer began using other coatings, *e.g.*, ME-92, with some of its blades in lieu of BRAZOL but still in combination with the licensed rib technology. In 1995, Linvatec, an affiliate of Zimmer, took over the obligation of issuing royalty payments to Alvarado under the license agreement.[1]  In 1997, Zimmer formally assigned all of its rights and obligations under the license agreement to Linvatec.

In 2008, Alvarado contacted Linvatec with concerns that (1) Linvatec was not using the then-current list prices of blades to calculate royalties under the agreement and (2) Linvatec failed to include in its reports-and thus failed to pay royalties on-some of the blades it sold. Unsatisfied with Linvatec's assurances that any decrease in sales stemmed from normal fluctuations in the market, Alvarado requested that Linvatec disclose the actual list prices for each blade sold under the agreement. Upon this disclosure, Alvarado alleges that it discovered Linvatec had been calculating royalty payments based on discounted sales price rather than the advertised list price as required under the agreement.

From late 2008 through August 2009, Linvatec assured Alvarado that it would investigate these concerns, but Alvarado was left to rely on Linvatec's representations in quarterly reports because (1) calculating the royalty payments involved a substantial amount of sales data and (2) only Linvatec had possession of the underlying data.

On February 4, 2011, Plaintiffs Alvarado and Holko filed a complaint against Linvatec alleging four causes of action for: (1) breach of contract, (2) breach of fiduciary duty, (3) fraud, and (4) accounting.  [Doc. No. 1.]  On August 23, 2011, the

---

[1] At the time, both Zimmer and Linvatec were wholly-owned subsidiaries of Bristol-Myers Squibb.  In 1997, Linvatec was sold to ConMed Corporation.

Court granted Linvatec's motion to dismiss and dismissed without prejudice Plaintiffs' claims for fraud and breach of fiduciary duty and their request for punitive damages. [Doc. No. 14.]

On October 17, 2011, Linvatec filed an amended answer, alleging six counterclaims for: (1) declaratory judgment; (2) breach of the covenant of good faith and fair dealing; (3) unjust enrichment; (4) breach of contract; (5) accounting; and (6) negligent misrepresentation. [Doc. No. 21.] The Court dismissed the majority of Defendant's counterclaims on February 8, 2012. [Doc. No. 40.] On February 28, 2012, Defendant filed a second amended answer, alleging counterclaims for, inter alia, (1) declaratory judgment and (2) money had and received. [Doc. No. 44.]

On October 17, 2012, the Court granted the parties' joint motion for the voluntary dismissal of Plaintiff Holko's claims against Linvatec, but leaving Linvatec counterclaims against Holko unaffected. [Doc. No. 61.]

Defendant filed the present motion for summary judgment on January 28, 2013. [Doc. No. 96.] Plaintiff Alvarado and CounterDefendant Holko filed separate opposition briefs on April 22, 2013. [Doc. Nos. 106, 107.] Defendant filed two reply briefs on April 29, 2013. [Doc. Nos. 108, 109.]

**DISCUSSION**

**I.   Summary Judgment Standard**

"Summary judgment is appropriate when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the nonmoving party, the movant is clearly entitled to prevail as a matter of law." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 950 (9th Cir. 2009) (citing Fed. R. Civ. P. 56). A material issue of fact is a question a trier of fact must answer to determine the rights of the parties under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

"When the moving party has the burden of proof at trial, that party must carry its initial burden at summary judgment by presenting evidence affirmatively

showing, for all essential elements of its case, that no reasonable jury could find for the non-moving party." *Fara Estates Homeowners Ass'n v. Fara Estates, Ltd.*, 134 F.3d 377, 378 (9th Cir. 1998); *see also Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) ("Where . . . the moving party bears the burden of proof at trial, it must come forward with evidence . . .") (emphasis omitted).  To carry its initial burden when the nonmoving party has the burden of proof at trial, the moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden [] at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000).

Under either scenario, "[i]f a moving party fails to carry its initial burden . . . the nonmoving party has no obligation to produce anything" and summary judgment must be denied.  *Id*. at 1102-1103; *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144,161 (1970) ("No defense to an insufficient showing is required.").  If the moving party does carry its initial burden, the nonmoving party "need only present evidence from which a jury might return a verdict in his favor.  If he does so, there is a genuine issue of fact that requires a trial." *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment.").

**II.     Analysis**

    **A.     Plaintiff Alvarado's Breach of Contract Claim**

Defendant Linvatec seeks summary judgment on Plaintiff Alvarado's breach of contract claim. [*See* Doc. No. 96 at 11-20.]  In California, "[a] cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008).  Defendant argues that no genuine dispute of material facts remains as to the elements of breach and damages,

and thus that summary judgment is appropriate. [*See, e.g.*, Doc. No. 96 at 12.] To the contrary, as discussed below, a genuine dispute of material facts remains as to both elements and thus Defendant is not entitled to summary judgment.

### 1. Summary Judgment as to the Element of Breach

Defendant asserts a variety of breach arguments, but all suffer from at least one common and fatal flaw. Plaintiff's breach of contract claim alleges Defendant underpaid royalties under the license agreement. Per the express terms of the agreement, royalties are owed on two categories of "Product": (1) "any Device" that infringes a "Valid Claim"; and (2) "any Device" that incorporates the "Technology." Defendant's breach arguments only address the "Valid Claim" category of royalties. But because the royalties at issue in this case do not necessarily depend on infringement of a "Valid Claim," even if all of Defendant's breach arguments are accepted, a genuine dispute of material facts remains as to whether royalties were underpaid as to "Devices" that incorporate "Technology." This failure alone renders summary judgment inappropriate as to the breach element.

Even ignoring this threshold failure, Defendant's individual breach arguments fail to warrant summary judgment.

### a. No Royalties Due On Non-BRAZOL Products

Defendant argues that no breach can be established for products not coated with BRAZOL, because the express terms of the license agreement only require royalties for products coated with BRAZOL. [*See* Doc. No. 96 at 12-14.] Plaintiff concedes that the written terms of the agreement entered into in 1989 appear to condition royalties on BRAZOL coating, but argues that the parties' "conduct and representations from 1995 onward" show that the parties modified the agreement to include royalties for non-BRAZOL product. [Doc. No. 106 at 12.]

Under California law, a written agreement may be modified by the parties' conduct, even if the written agreement includes a clause expressly prohibiting modification. *See Wagner v. Glendale Adventist Med. Center*, 216 Cal. App. 3d 1379, 1388 (Cal. Ct. App. 1989). "When one party has, through oral representations

and conduct or custom, subsequently behaved in a manner antithetical to one or more terms of an express written contract, he or she has induced the other party to rely on the representations and conduct or custom. In that circumstance, it would be [] inequitable to deny the relying party the benefit of the other party's apparent modification of the written contract." *Id.*; *see also Biren v. Equality Emergency Medical Group, Inc.*, 102 Cal. App. 4th 125, 141 (Cal. Ct. App. 2002). Thus, "where the subsequent conduct of parties is inconsistent with and clearly contrary to provisions of the written agreement, the parties' modification setting aside the written provisions will be implied." *Diamond Woodworks, Inc. v. Argonaut Ins. Co.*, 109 Cal. App. 4th 1020, 1038 (Cal. Ct. App. 2003). But "[b]efore a contract modifying a written contract can be implied, the conduct of the parties according to the findings of the trial court must be inconsistent with the written contract so as to warrant the conclusion that the parties intended to modify the written contract." *Id.*

Here, the license agreement provides royalties only for units of "Product" sold, defines "Product" to require a "Device," and defines "Device" to require BRAZOL coating. [*See* Agreement I, IV.] Thus, together, these terms of the written agreement limit royalties to blades with BRAZOL coating. Further, the agreement states that the "parties may modify . . . the provisions of th[e] Agreement, but only by an instrument duly executed by both parties." [Agreement XX.]

Yet, the parties both acknowledge that for many years Linvatec paid royalties for non-BRAZOL coated blades. Moreover, correspondence between the parties and other evidence suggests that these royalty payments were not mistaken, but rather intended. [*See, e.g.*, Doc. No. 96-4, Ex. 11 (May 24, 1995 Letter from Linvatec to Alvarado) ("Additionally, royalties for all Linvatec Products which are not Brazol coated should be paid to you in full."); Ex. 12 (Sample Royalty Percentage Sheet listing 6% royalty rate for a range of non-BRAZOL coated blades); Ex. 17 at 11 (Deposition of Gene Warzecha, Linvatec employee responsible for calculating royalties under the agreement) ("it was my understanding that ribbed, no coat blades were supposed to be paid 6 percent royalty.").]

The conflict between the written agreement's express terms and the apparently inconsistent conduct of the parties raises genuine factual disputes as to whether the parties intended to modify the contract to provide royalties for non-BRAZOL coated blades.[2] *See Zarate v. Bruker Nano, Inc.*, 2013 WL 1247929, at *2 (Cal. Ct. App. 2013) ("Where there is conflicting evidence, the question of whether the parties entered into a . . . modification is a question of fact."). These genuine issues of material fact as to the parties' intent render summary judgment improper. *See U.S. v. Sacramento Municipal Utility Dist.*, 652 F.2d 1341, 1344 (9th Cir. 1981) (where intent of the contracting parties is unclear "ordinarily summary judgment is improper as differing views of the intent of the parties will raise genuine issues of material facts."). Because genuine issues of material fact remain regarding the intent of the parties and whether the contract was modified, summary judgment on these grounds is inappropriate.

### b. Lack of Standing To Sue Because '597 and Canadien Patents Were Not Assigned

Defendant further argues that because Alvarado never became an assignee of any rights in the '597 and Canadian Patents, Alvarado lacks standing to assert breach of contract for underpaying royalties derived from these patents. [*See* Doc. No. 96 at 14-16.] Defendant's argument fails on both the facts and the law.

Factually, the lack of a written assignment is inconsequential because both the '597 and Canadian Patents appear within the agreement's express definition of the "Licensed Patents." The "Licensed Patents" encompass "the patent(s) and/or patent applications specified in Attachment B and any and all other patents and/or patent applications [] now or hereinafter during the term of the Agreement," as well as, inter alia, "any and all . . . continuations, continuations-in-part . . ." [Agreement at I.C.] Attachment B lists, *inter alia*, the "'608" patent application, of which the '597

---

[2] Defendant argues any modification was invalid if not "fully executed." [Doc. No. 108 at 3.] Although that could be true of a purported oral modification, *see* Cal. Civ. Code 1698, modification implied by conduct, as asserted here, does not depend on "full execution," *see, e.g., Duke Kelso Construction, Inc. v. Silva*, 2013 WL 1393475, at *13 (Cal Ct. App. 2013).

patent is a continuation-in-part, and "corresponding foreign applications" in, among other locales, Canada. [*See* Doc. No. 96-3 at 22.]  Thus, because the '597 Patent and the Canadian Patent fall within the express language of the license agreement, written assignment appears unnecessary.

Legally, Defendant's argument is misconstrued; it rests on inapposite case law and conflates standing to sue for patent infringement with standing to sue for breach of contract. Defendant relies on several Federal Circuit decisions, concerning whether an assignee has standing to sue for patent infringement, to argue that because the '597 and Canadian Patents were never assigned in writing, Alvarado lacks standing to sue for breach of contract here. [*See* Doc. No. 96 at 14-16.]  This line of argument is non sequitur.  The present case turns on California law regarding standing to sue for breach of contract, not Federal Circuit law governing standing to sue for patent infringement.  Under California law, it is axiomatic that a party to a contract has standing to sue for breach of that contract. *See, e.g., Emerald Bay Community Assn. v. Golden Eagle Ins. Corp.*, 130 Cal. App. 4th 1078, 1092 (Cal. Ct. App. 2005).  Here, it is undisputed that Alvarado is a party to the license agreement. Thus, Alvarado has standing to sue for breach of that agreement.  *Cf. Applera Corp. v. MP Biomedicals, LLC*, 173 Cal. App. 4th 769 (rejecting similar standing challenge, emphasizing that "the case before us is a breach of contract action for royalties against a license, and not a patent infringement action . . .").

In any event, as stated *supra*, even if these two patents are outside the purview of the license agreement, Defendant fails to explain how that would preclude the existence and extent of the alleged breach.  Royalties are based on units sold regardless of which and how many patent claims they infringe. [Agreement at IV.C.]  Indeed, under the "incorporate Technology" track, royalties may be due even if no patent claims are infringed.  *See infra*.  Consequently, even if Defendant's position was accepted, a genuine dispute as to whether and to what extent a breach occurred remains rendering summary judgment inappropriate.

    **c.**   **No Breach Because the '533 and '728 Patents Expired**

The parties agree that the '533 and '728 Patents expired in 2004 due to Plaintiff's own failure to pay required maintenance fees.  Defendant argues that thus no royalties could have been owed under these patents post-2004.  Coupled with its argument that the statute of limitations renders all breaches prior to 2007 nonactionable, Defendant contends no actionable breach can derive from these expired patents.  But a genuine dispute remains as to when the statute of limitations began to run.  *See infra*.  Thus, notwithstanding the expiration of these patents in 2004, a genuine dispute remains as to whether pre-2004 breaches related to these patents remain actionable.

Moreover, even as to post-expiration breaches, the expiration of these patents does not necessarily impact the royalties due under the terms of the licensing agreement.  The license agreement requires royalties based on each unit of Product sold "regardless of the number of Valid Claims of Licensed Patents covering the same." [Agreement at IV.C.]  Defendant fails to show the number of units sold that are not subject to royalty but for the validity of these two patents.  Without such a showing, a genuine dispute remains as to whether the expiration of these two patents had any affect on the royalties owed under agreement.

And even if expiration of two of five patents does eliminate royalties based on units infringing the claims in those patents, royalties could still be due on those very same units for infringing claims in the other three patents.  Also, even if the expiration of these two patents shows that certain units do not infringe any claim, royalties could still be due on the basis that the units of Product incorporate "Technology" under the terms of the agreement.  At bottom, under the terms of the agreement, royalties owed may be the same regardless of whether and when these patents expired.

Nor does the doctrine announced in *Brulotte v Thys Comp.*, 379 U.S. 29 (1964), bar royalties beyond the expiration of the '533 and '728 Patents.  Defendant

overstates this controversial[3] Supreme Court opinion as holding that "a patentee cannot enforce a licensee's obligations to pay royalties under a patent license agreement beyond a patent's expiration date." [Doc. No. 96 at 18.] The Ninth Circuit acknowledges that where, as here "the contract at issue covers a bundle of patents that expire at different times," "*Brulotte* explicitly h[olds] that royalties on a product are unenforceable only 'after the last of the patents incorporated into the machines . . . expire[s]." *Zila, Inc. v. Tinnell*, 502 F.3d 1014, 1025-26 (9th Cir. 2007) (quoting *Brulotte*, 379 U.S. at 29-30).

In *Zila*, the Ninth Circuit applied the *Brulotte* doctrine to a license agreement royalty provision that did "not reference any specific patent," but rather provided "a five percent (5%) royalty on gross sales . . . of the invention." *Id.* at 1024. The Ninth Circuit refused to "read *Brulotte* so mechanically as to render the royalty provision [] necessarily unenforceable as of [] expiration." *Id.* Had the provision "provided royalties only on the [expired] patent, those royalties could not be enforced after [expiration]." *Id*. at 1025. But because the provision provided royalties on sales of the "invention," royalties could be owed on products embodying the "invention" independent of the expired patent. *Id*. In so holding, the Ninth Circuit reasoned that "[w]hen an inventor is listed on an application for a patent, and a patent issues, he has . . . the right to exploit the federal patent monopoly, empowering him to exact royalties as high as he can negotiate with the leverage of that monopoly." *Id.* at 1026. "Whether this monopoly consists of one patent or a dozen, the ability to exact royalties runs to the last of the patents providing monopoly protection." *Id*.

Here, as in *Zila*, the license agreement at issue covers a number of patents with different expiration dates, and under its express terms, royalties are not limited to any specific patent; rather royalties depend on units of product sold. "Product"

---

[3] *See Zila*, 502 F.3d at 1022 (noting "the lack of economic logic laid at [*Brulotte's*] feet by . . . a bevy of commentators."); *see also Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1017 (7th Cir. 2002) ("The decision has, it is true, been severely, and as it seems to us, with all due respect, justly, criticized.") (Posner, J.).

warranting royalties is two-fold, encompassing both "any Device . . . which would . . . infringe a Valid Claim," and also "any Device incorporating, or the manufacture, use or sale of which utilizes the Technology." [*See* Agreement I.]  Thus, the license agreement provides for royalties regardless of infringement of any patent claim. And by its very terms, the obligation to pay royalties does not depend on any specific patent, but rather "remain[s] in effect until and will expire upon the expiration of the last to expire of the patents, U.S and foreign, licensed [under the agreement]." [Agreement XIV.A.]  As such, consistent with *Brulotte*, royalties are recoverable per the terms of license agreement until the last patent expires. *Zila*, 502 F.3d at 1026.

In light of the foregoing, Defendant's arguments regarding the expiration of the '533 and '728 Patents do not warrant summary judgment.

### 2. Summary Judgment as to the Element of Damages

Defendant also moves for summary judgment on the grounds that no genuine dispute of material fact remains as to damages.  In support, Defendant argues that any alleged damages prior to February 4, 2007 are barred by the statute of limitations and that overpayment of royalties during 2004-2009 exceed any damages purportedly suffered by Alvarado. [*See, e.g.*, Doc. No. 96-1 at 11 n.4.]  Because a genuine dispute remain as to both arguments, Defendant is not entitled to summary judgment on the element of damages.

### a. Statute of Limitations

"The statute of limitations is an affirmative defense." *Ladd v. Warner Bros. Entertainment, Inc.*, 1847 Cal. App. 4th 1298, 1309 (Cal. Ct. App. 2010); *Samuels v. Mix*, 22 Cal.4th 1, 10 (Cal. 1999).  As with any affirmative defense, Defendant bears the burden of proof at trial, *see id*, and thus "must carry its initial burden at summary judgment by presenting evidence affirmatively showing, for all essential elements of its case, that no reasonable jury could find for the non-moving party." *Fara Estates*, 134 F.3d at 378.  Where, as here, a defendant asserts that "a part of plaintiff's claim for damages is barred by the statute of limitations . . . the defendant pleading the

statute as an affirmative defense has the burden of specifically proving which portion of plaintiff's damages are barred by the statute. Failure to so prove will result in a complete failure of the affirmative defense . . . The obligation to segregate the damage should fall upon the wrongdoer and not upon the person he has harmed." *Ladd*, 1847 Cal. App. 4th at 1310.

"California's statute of limitations for breach of a written contract is four years." *Gabriel Tech. Corp. v. Qualcomm Inc.*, 857 F.Supp.2d 997, 1010 (S.D. Cal. 2012) (citing Cal.Code Civ. Proc. § 337). "Generally, a cause of action for breach of contract 'accrues at the time of the breach' and the statute begins to run 'regardless of whether any damage is apparent or whether the injured party is aware of their right to sue.'" *Id.* (quoting *Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F.Supp.2d 1127, 1134 (N.D. Cal. 2006)). But a "more lenient 'discovery rule' is applied in select cases where (1) '[t]he injury or the act causing the injury, or both, have been difficult for the plaintiff to detect'; (2) 'the defendant has been in a far superior position to comprehend the act and the injury'; and (3) 'the defendant had reason to believe the plaintiff remained ignorant he had been wronged.'" *Id.* (quoting *Perez-Encinas*, 468 F.Supp.2d at 1134).

"Under the 'discovery rule,' a breach of contract claim accrues when the plaintiff 'discovers or could have discovered, through the exercise of reasonable diligence, all of the facts essential to his cause of action.'" *Id.* "When a plaintiff reasonably should have discovered facts for purposes of the accrual of a [cause] of action or application of the delayed discovery rule is generally a question of fact, properly decided as a matter of law only if the evidence . . . can support only one reasonable conclusion." *Broberg v. Guardian Life Ins. Co. of America*, 171 Cal. App. 4th 912, 921 (Cal. Ct. App. 2009) (citing *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1112 (Cal. 1988)).

Here, Defendant fails to carry its burden. Defendant makes no attempt to show that the discovery rule is inapplicable; rather, in a footnote in its reply, Defendant implies the burden is on the Plaintiff. [Doc. No. 108 n.4 ("Alvarado

provides no justification for the use of the more lenient discovery rule.").] Alvarado need not justify the application of the discovery rule, for the burden lies with Defendant. *See Broberg*, 171 Cal. App. 4th at 921. Moreover, uncontroverted facts in the record at the very least raise a genuine dispute as to the discovery rule's applicability. For example, because Defendant alone possessed the underlying sales and derivative royalty data, Defendant appears to have been in a superior position than Plaintiff to detect underpayment of royalties based on that data. [*See, e.g.*, Doc. No. 1 at 4-6 (describing Linvatec's "superior position over Alvarado and Holko concerning the amount of royalties due" and "unequal" access to "sales data . . . used to calculate the amount owing under the Licensing Agreement".] This disparity in access to data and ability to comprehend the injury can support application of the discovery rule to breach of contract claims. *See Gabriel Tech. Corp.*, 857 F.Supp.2d at 1010; *see also Gryczman v. 4550 Pico Partners, Ltd.*, et al., 107 Cal. App. 4th 1, 5-6 (Cal. Ct. App. 2003).

Nor does Defendant attempt to establish when in fact Plaintiff should have discovered the alleged underpayment of royalties. In a footnote in its opening brief, without any supporting facts, Defendant merely states that "Alvarado could have discovered the underpayments allegedly owed by Linvatec through the exercise of reasonable diligence." [*See* Doc. No. 96 at 11 n.4.] On reply, Defendant similarly asserts that "[b]ecause Alvarado alleges Linvatec's underpayment began prior to 2004, Alvarado's breach of contract claim is barred under the traditional statute of limitations." [Doc. No. 108 at 9.] These conclusory assertions fall far short of establishing that no reasonable jury could find other than for Defendant as to when Plaintiff's claims were discoverable. Thus, Defendant fails to carry its initial burden on the statute of limitations affirmative defense.

        **b.**      **Evidence of Over- or Under- Payment of 2004-2009 Royalties**

But even had Defendant established that Plaintiff's claims were discoverable as of February 7, 2007, summary judgment on damages would still be inappropriate because Defendant has failed to establish specifically what damages are time-barred.

*Ladd*, 1847 Cal. App. 4th at 1310 ("the defendant pleading the statute as an affirmative defense has the burden of specifically proving which portion of plaintiff's damages are barred by the statute. Failure to so prove will result in a complete failure of the affirmative defense"). Defendant merely declares that it overpaid by approximately $3 million during 2004-2009. [*See, e.g.*, Doc. No. 96 at 19-20.] This amount does not necessarily, let alone specifically, reflect any portion of Plaintiff's alleged damages, time-barred or otherwise. It simply reflects an amount paid by Defendant. Moreover, even if this amount exceeds Plaintiff's alleged damages during 2004-2009, the purported overpayment says nothing of whether Plaintiff suffered post-2009 damages. Accordingly, Defendant fails to carry its burden.

Because Defendant fails to carry the initial summary judgment burden on its statute of limitations affirmative defense, the burden does not shift to Plaintiff to come forward with evidence raising a genuine dispute of material fact as to the statute of limitations. *See Adickes*, 398 U.S. at 161. But even if Defendant had met its initial burden, a genuine dispute of material facts is plainly apparent from the record preventing summary judgment on statute of limitations grounds. Plaintiff has produced declarations of persons familiar with the patents, license agreement, and years of royalty payments thereunder, which declare based on an analysis of the license agreement and discovery produced by Linvatec that "at least $900,000 in royalties were not paid from 2004 through 2009 alone." [*See* Doc. No. 106-2].

For all the foregoing reasons, Defendant fails to warrant summary judgment as to the element of damages.

### B. Defendant Linvatec's Counterclaims

In addition to seeking summary judgment on Plaintiff's breach of contract claim, Defendant seeks summary judgment on its own money had and received and declaratory judgment counterclaims, and requests sanctions against Plaintiff's counsel. [*See* Doc. No. 96 at 21-22.] For all the reasons discussed above, a genuine dispute remains as to, *inter alia*, whether and to what extent each party owes the

other under the license agreement. *See supra*. This alone renders summary judgment on Defendant's counterclaims inappropriate. So too, because genuine dispute remains, Plaintiff's claims can hardly be labeled frivolous, let alone sanctionable.

### 1. Linvatec's Money Had and Received Counterclaim

Under California law, "[a] claim for money had and received is stated where a plaintiff alleges that a defendant is indebted to the plaintiff in a certain sum for money had and received by the defendant for the use of the plaintiff." *Mahoney v. Fidelity Nat. Title Co.*, 2008 WL 4286934, at *4 (C.D. Cal. Sept. 15, 2008) (quoting *Schultz v. Harney*, 27 Cal.App.4th 1611, 1623 (1994)). Here, Defendant Linvatec asserts that it should recover mistakenly overpaid royalties. For all the reasons discussed above, Defendant has not established that it in fact overpaid royalties, nor that any such payment was mistaken. Thus, Defendant is not entitled to summary judgment on its money had and received counterclaim.

### 2. Linvatec's Declaratory Judgment Counterclaim

Defendant also seeks declaratory judgment on the following, all of which parallel its challenges to Plaintiff's breach of contract claim, *i.e.*, (1) that Plaintiff lacks standing as to the '597 and Canadian Patents; (2) that no royalties required for non-BRAZOL coated blades; (3) that no royalties owed on expired patents post-expiration; (4) that overpaid royalties exceed any damages to Plaintiff; and (5) that Linvatec is entitled to recover overpaid royalties. [*See, e.g.*, Doc. No. 109 at 9-10.] For all the reasons discussed above, Defendant is not entitled to summary judgment on its declaratory judgment counterclaims.

### 3. Linvatec's Request for Sanctions

Defendant also cursorily requests that Plaintiff's counsel be sanctioned under 28 U.S.C. § 1927 and the Court's inherent authority "for continuing to litigate a legally deficient claim." [Doc. No. 96 at 21.] "[S]ection 1927 sanctions must be supported by a finding of subjective bad faith," which "is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim

for the purpose of harassing an opponent." *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1107 (9th Cir. 2002). Sanctions under the Court's inherent authority are similarly available only if "the court specifically finds bad faith or conduct tantamount to bad faith." *Id*. at 1108.

As discussed *supra*, Plaintiff's claims are not frivolous. Even if they are, Defendant makes no attempt to show any intent to harass, bad faith, or conduct tantamount to bad faith by Plaintiff. Thus, sanctions are wholly unwarranted under either section 1927 or the Court's inherent authority. *B.K.B.*, 276 F.3d at 1107-1108.

## CONCLUSION

For the foregoing reasons, the Court hereby **DENIES** Defendant's motion for summary judgment in its entirety.

**IT IS SO ORDERED.**

**DATED:** May 24, 2013

**IRMA E. GONZALEZ**
**United States District Judge**